IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT |
| | : | No.: 1:12-CR-00016-RWS-GGB |
| PAUL L. BLACK, | : | |
| a/k/a Marcus Lively, | : | |
| | : | |
| and | : | |
| | : | |
| EDNECDIA SUTINA JOHNSON, | : | |
| a/k/a Tina Johnson | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

COMES NOW the United States of America, by Sally Quillian Yates, United States Attorney, and Christopher J. Huber, Assistant United States Attorney, Northern District of Georgia, and hereby files the Government's Sentencing Memorandum with respect to Paul Black and Ednecdia Johnson  to assist the Court in resolving disputed Guideline issues and in imposing a reasonable sentence under 18 U.S.C. § 3553.

## <u>INTRODUCTION</u>

This case began with a home invasion that left one of the participants in a coma with a bullet wound to the head and left one of the residents of the house with two fingers shot off by a shotgun.  The crime scene had pools of blood in

multiple rooms and bullet holes in the walls.  The responding officers found blood smeared on a door handle in the basement and discovered almost $200,00 in cash and over $380,000 worth of jewelry in the house.  In short, there were all the hallmarks of a drug deal gone bad, but in this case, the contraband found at the house was not drugs, but credit and debit card account numbers – over 97,000 account numbers – and a sophisticated lab in the home's basement equipped to make counterfeit credit cards and photo identifications.

The two residents of the house, Defendants Paul Black and Ednecdia Johnson, were indicted on charges of access device fraud–possessing counterfeit access devices,18 U.S.C. § 1029(a)(3), access device fraud–possession of device-making equipment, 18 U.S.C. § 1029(a)(4), possessing five or more false identification documents, 18 U.S.C. § 1028(a)(3), and possession of a document-making implement, 18 U.S.C. § 1028(a)(5).  Both Defendants pleaded guilty to all the charges in the indictment.  Neither had a plea agreement and Ms. Johnson entered her plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).  They are being sentenced on all four counts.

In dispute are several Sentencing Guidelines enhancements under U.S.S.G. § 2B1.1 applicable to both Defendants, including the appropriate loss amount, the number of victims, and whether a dangerous weapon was possessed in connection

with the offense.  Ms. Johnson also objects to the enhancement for obstruction.
The Government objects to the recommendation that Ms. Johnson receive a two
level reduction in offense level for acceptance of responsibility.

Both PSRs correctly recommends that the loss amount is more than $20
million based on the conclusion that approximately 59% of the more than 97,000
credit and debit card account numbers found in the house were valid and that each
valid account number is subject to the $500 minimum loss amount set forth in the
Guidelines.  The PSRs also correctly recommends that the Court find there are 50
or more victims.  There were at least 133 fraudulent physical credit cards encoded
with valid account numbers, plus an additional 17 fraudulent cards that were used
to purchase gift cards for Ms. Johnson, leading to a conclusion that there are a
minimum of 150 victims.  The enhancement for possession of a dangerous weapon
in connection with the offense is also supported by the evidence.  The officers who
searched the Defendants' house found two pistols in the credit card lab.  Ms.
Johnson should receive the two level increase for obstruction of justice because she
perjured herself during her bond hearing while testifying about seven fake IDs with
her picture on them.  Finally, because Ms. Johnson has never accepted
responsibility and continues to deny any criminal intent, she is not entitled to a two
level reduction in her offense level for acceptance of responsibility.

- 3 -

## BACKGROUND

### I.   Officers Discover A Sophisticated Credit Card Lab When Responding to a Home Invasion

At 12:15 a.m., December 21, 2011, the Clayton County 911 center received a call from 9154 Betony Wood Trail reporting a residential burglary.  (Doc. 87 at 16, 22, 24).  During the 911 call, the caller, later identified as Defendant Ednecdia Johnson, said that there was yelling that sounded like someone robbing the house.  (Doc. 87 at 28, 29).  Clayton County police officers responded within minutes.  (Doc. 87 at 28, 30).  Upon arrival, officers discovered an individual at the foot of the driveway with a bullet wound to his head.  (Doc. 87 at 68).  This individual was in a coma for a lengthy period, and now has an impaired mental state, apparently as a result of the shooting.  (Ex. 1).

The officers also found the front door of the house kicked in and saw a sawed-off pump shotgun in a large pool of blood in the foyer.  (Doc. 87 at 69-71).  Blood was also on the columns in the foyer and the walls had bullet holes that he officers recognized as coming from pistol fire.  (Doc. 87 at 237).  There was more blood splatter and human matter on the hall floor and walls.  Ex. 2 at 3.

The responding officers searched the house, beginning on the ground floor where they found more blood in the master bedroom, including on both doors and

at the foot of the bed.  Ex. 2 at 3.  The bedroom door also had been shot by a
shotgun and the door that led from the bedroom to the backyard was also smeared
with blood.  After searching the rest of the house, the officers moved to the
basement.  In the basement, the officers discovered a trail of blood leading to a
locked door.  (Doc. 87 at 83).  Blood was smeared on the handle of the locked
door.  (Doc. 87 at 83).  Officers forced the door open and when they entered the
room they found a sophisticated credit card lab that contained credit card presses,
computers, printers, card embossers, stacks of blank credit cards and partially
completed cards, cash, and two handguns.  (Doc. 87 at 87-90, 172-73, 222-23;
Doc. 88 at 396-97).

    Photos taken at the time show the violent and extensive nature of the gun
fight.  Ex. 3.[1]  They show the pool of blood in foyer, the blood throughout the
master bedroom, and the shotgun blast to the door.  Ex. 3.

---

[1] These photographs, and the photographs in Exhibit 4, were the subject of a
motion to suppress by Defendants that was denied in most part, but was granted as
to the photographs.  Doc. 119 at 3.  They may be properly considered by the Court
at sentencing, however, because the Eleventh Circuit has "decline[d] to extend the
exclusionary rule to sentencing proceedings."  *United States v. Lynch*, 934 F.2d
1226, 1237 (11th Cir. 1991); *United States v. Marchante*, 514 F. App'x 878, 884
n.5 (11th Cir. 2013) ("Generally, the exclusionary rule does not apply to
sentencing proceedings, provided the evidence being considered is reliable and was
not seized 'solely to enhance the defendant's sentence.'").

Officers obtained and executed a search warrant, finding the evidence that forms the basis of the charges in this case.  The evidence found included:

- Device-making equipment:

    - (4) Fargo DTC400E Card Printer/Encoders
    - Fargo C30E Card Printer/Encoder
    - Zebra P330I Card Printer
    - Toho CM-30 Manual Tipper Embosser
    - Card Embosser (Manual)
    - Custom Card Systems CCS200 Card Embosser
    - Datacard Card Printer 150I
    - Maxima Card embosser and tipper, Model 861

- Document Making Equipment:

    - Fago Plasticard Plastic Card Systems Card Printer DTC525
    - Akiles Prolam Photo Laminator

- Computers and storage devices:

    - multiple laptops and desktops
    - multiple thumb drives
    - multiple external hard drives

- Approximately 875 completed, counterfeit physical credit and debit cards

- Two handguns, a Taurus Millennium Pro PT 145 and a Kel-Tec P-11, both with matching ammunition.  These were both found in the basement credit card lab.

- Boxes of blank card stock and credit and debit cards in various states of completeness, totaling approximately 8,000 cards

- $199,267 in cash

- Jewelry valued at over $382,000

- 6 -

- $43,223.33 worth of gift cards

- Counterfeit state IDs and driver's licenses:

  o 7 false licenses from various states with Ms. Johnson's photo
  o Georgia driver's license with Mr. Black's picture in name of Marcus Graham
  o Approximately 100 completed counterfeit state driver's licenses with various names and pictures

The machinery was found in the basement lab, and was part of a large set up to manufacture fraudulent credit cards and ID cards.  *See* Ex. 4 (photos of the lab).

## II.    Analysis of the Information and Account Numbers Found in the Lab

The Secret Service examined the computers, hard drives, and other storage devices found in the basement lab.  On these devices, the Secret Service found numerous files containing credit card and debit card numbers, templates for creating credit and debit cards, templates for creating false IDs, images of false IDs in various stages of creation, price lists for the purchase of credit and debit card numbers, templates and instructions for creating fraudulent social security cards, instructions of how to use ATM card skimmers, lists of urls for websites that appear to be related to purchasing stolen credit card numbers, and software to

create fraudulent credit cards.  *See* Exs. 5-16.[2]  An examination of the properties of the electronic files identified during the analysis of the computers and storage devices show that many of them pre-date the period during which the Defendants lived in the house at 9154 Betony Wood Trail.  For example, the file "MASTERS LIST.txt" found on the Sony Magic Gate Memory Stick Pro 2 has properties that show it was created and accessed on December 4, 2007.  (Ex. 5).  That file has 1,318 <u>pages</u> of credit and debit card information, including account numbers, bank names, card holder names, and card type.  (Ex. 5).  Among the many other files that predate the middle of 2011 and contain credit and debit card numbers, and other significant information, were the following:

- "LIST-1.txt", dated February 27, 2007, 5 pages of credit and debit card numbers, with card holder names and bank names (Ex. 6);

- "CE DISCO 1000 U MADE IT.txt", dated March 15, 2008, 22 pages of credit and debit card numbers (Ex. 7);

- "frttxt1.psd" and "bbk.psd", dated March 23, 2008, images for the front and back of a BankOne credit card (Ex. 8);

- "PRIMO DISO GAS", dated June 10, 2008, half a page of credit and debit card numbers (Ex. 9);

---

[2] The Exhibits to this sentencing memorandum are filed under seal because they contain personal financial information, including bank account numbers and credit card numbers.

- "convo 2.txt", dated December 26, 2010, 10 pages of messages discussing "carding" (Ex. 10);

- "12-23-10 100.txt", dated December 28, 2010, 14 pages of debit card numbers with card holder and bank names (Ex. 11);

- "12-14-10 to 12-27-10 logs", dated December 30, 2010, 17 pages of user ID and passwords email accounts and bank accounts (Ex. 12);

- "price-2011-01-12.txt", dated January 12, 2011, 14 page price list for credit and debit card numbers (Ex. 13);

- "ch 150 order.txt", dated January 17, 2011, 9 pages of debit card numbers with card holder and bank names.  The bank identification numbers for these cards are included on the price list above (Ex. 14);

- "237 ready.txt", dated March 26, 2011, 9 pages of credit and debit card numbers with card holder names (Ex. 15);

- "reported bins.txt", dated April 12, 2011, 19 pages listing BINs with comments regarding the usefulness of certain of the BINs (Ex. 16).

The "convo 2.txt" file captures a discussion between two people regarding bank fraud and carding.  It begins with a discussion of fraudulently transferring money out of individuals' accounts (going so far as to identify one individual they intended to victimize).  It then moved on to a discussion of swiping fraudulent credit cards and lamented that "its hard to swipe more than 3k without getting the account freezed. . . . before we swipe 5 to 10k and no problems."  Ex. 10 at 6.  The individuals went on to say they were making "15 to 30k a days . . . . some time

40k, but not lately." Ex. 10 at 6-7.  And one said that "sometimes i make 1000 cards a day" with "90k worth of machinery." Ex. 10 at 7.

Another file, "reported bins.txt", lists many bank identification numbers (BINs).  BINs are the first six digits of a credit or debit card account number that identify the issuing bank of the credit or debit card.  This file identifies BINs and the associated banks and has notes about those BINs that would be of interest to individuals creating fraudulent credit cards.  For example, for various BINs, it states:

- "Works in New york for more than 5k in one transaction" (Ex. 16 at 3);

- "work good in us, texas, like 1.5k" (*Id.*);

- "good bin usa for 1k$" (*Id.*);

- "Balance up to 1000usd" (*Id.*);

- "balance 1k us" (*Id.*);

- "balance 1.5k" (*Id.*);

- "balance $800" (*Id.*);

- "work in NYC 500$ to 2000 give multi swipes its debit" (Ex. 16 at 4);

- "good work in usa 5k$-7k$ approval" (Ex. 16 at 5);

- "2k working in usa" (Ex. 16 at 5);

- "it works in new york, balance up to 1000 dollars" (Ex. 16 at 10); and

- "working good in usa and i cauh 2k en each one" (Ex. 16 at 11).

The Secret Service analyzed the electronic files found on the computers and electronic storage devices for potential credit and debit card numbers.  It also swiped the magnetic strips of the physical cards that were found during the search. It sought to identify credit and debit card account numbers based on valid BINs. Combining the electronic account numbers found from the analysis of the computers and other storage devices and the account numbers from the physical cards, the Secret Service identified 97,922 unique account numbers that utilized valid BINs.

The Government conducted a statistically valid random sample of those numbers 97,922 account numbers.  In order to create that sample, the Government utilized two different sample size calculators on the internet, one identified by the US Department of Health and Human Services.[3]  The second calculator is located on the website for the Australian National Statistical service.[4]

---

[3] The web address for the relevant site is: http://bphc.hrsa.gov/policiesregulations/performancemeasures/patientsurvey/calculating.html. That site links to the actual calculator:  http://www.macorr.com/sample-size-calculator.htm.

[4] http://www.nss.gov.au/nss/home.nsf/pages/Sample+size+calculator.

For both calculators, the Government set the confidence level desired at 95%, the confidence interval at 5%, and the population at 97,922.  Both calculators returned a sample size of 383.  The Government then took the entire universe of 97,922 account numbers and, using Excel, applied the random number calculator to assign a random number to each account number.  The spreadsheet was then sorted from smallest to largest and the first 383 account numbers were used as the sample.  The Government then subpoenaed each American bank connected with those 383 account numbers, based on the BIN, asking for account information related to each account number.[5]  The results of those subpoenas are reflected in Exhibit 17.  They show that 227 of the accounts in the random sample were valid account numbers – that is, they correspond with an actual credit or debit card.[6]  Thus, at least 59% of the account numbers in the sample represented actual credit or debit cards.

---

[5] Because the Government did not expect foreign banks to respond to a subpoena, the Government did not subpoena foreign banks, but did not exclude them from the sample.

[6] The numbers vary slightly from those in the PSRs.  In preparing for sentencing, the Government reviewed each subpoena response again and corrected any errors in its previous analysis.

A similar process was used to create a sample of the 887 physical cards that were found in the house.  Using the same parameters, the Government selected a random sample of 268 account numbers.  Again, subpoenas were issued to the American banks associated with these account numbers, seeking to identify which of the account numbers represented valid accounts.  The results are reflected in Exhibit 18.  For these account numbers, 133 were returned as valid accounts (approximately 50% of the 268 account number sample).

### III.   Ms. Johnson's Credit Card Fraud

At the time the credit card lab was found in Ms. Johnson's house, she claimed to be self-employed at the ESJ Group.  The ESJ Group had a merchant account–that is, an account established with a credit card processor that allows the ESJ Group to receive funds from credit or debit cards.  After discovering the credit card lab in the Betony Wood Trail house, the Government analyzed the merchant account tied to the ESJ Group.  This analysis identified 96 American Express gift cards that were processed into that account (that is, gift cards that had value transferred into the ESJ Group merchant account).  (See Ex. 19).   These gift cards were purchased at various locations, including multiple purchases at Kroger.  The Government subpoenaed Kroger to provide the transaction information for purchase of those cards, including the number of the credit card used to purchase

- 13 -

the gift cards.  (Ex. 20).  The credit card numbers identified by Kroger were compared with the credit cards numbers found in the lab.  At least 17 credit card numbers from the lab were used to purchase 42 American Express gift cards that were ultimately processed by ESJ Group, resulting in $8,900.00 being deposited into ESJ Group's bank account.  Of the 17 credit numbers, 12 of them belong to foreign banks in Mexico.  The other five belong to three banks in the United States, which each provided records that included disputes for the charges for the American Express gift cards.

The Government also subpoenaed the transaction history for the ESJ Group account, which showed that the American Express gift cards purchased at Kroger using the credit card numbers from the lab were processed (keyed in manually) by ESJ Group.  (Ex. 21).  In addition, the SunTrust bank account for ESJ Group shows direct deposits to that account for American Express gift cards.  (Ex. 22).  In total, more than $34,000 worth of gift cards were deposited into the SunTrust account for ESJ Group from March 2011 through December 2011.

## IV.   Ms. Johnson's Bond Hearing

During the hearing on Ms. Johnson's motion to revoke the order of detention against her in this case, Ms. Johnson testified that she was the sole signatory on the rental agreement for the 9154 Betony Wood Trail house, which was being leased

for $4,000 per month.  (Doc. 97 at 23; Ex. 23).  Ms. Johnson's probation officer testified that Ms. Johnson reported an average income of $4,234.26 from April through November 2011.  (Doc. 97 at 38).  In response to the probation officer's question about employment, Ms. Johnson claimed that she was self-employed as a consultant, at both Interface Inc. and ESJ Group, from January 2004 through December 2011.  (Johnson PSR ¶ 72).

At that same hearing, Ms. Johnson denied that she had ever used the seven fraudulent driver's licenses found in her study.  (Doc. 97 at 20).  She claimed that all seven had been in storage for "more than eight years" and that they were only "for novelty."  (Doc. 97 at 19, 20).  But, she admitted on cross-examination that at least three of them had issue dates in 2009.  (Doc. 97 at 27-28).  Nevertheless, she did not change her testimony that they were more than eight years old or that they were merely novelty items.

## **ARGUMENT**

There are five issues related to the application of the Sentencing Guidelines that are in dispute.  Both Mr. Black and Ms. Johnson object to the loss amount, victim enhancement, and two-level increase for possession of a firearm in connection with the offense.  Ms. Johnson objects to the adjustment for obstruction

of justice.  Finally, the Government objects to any reduction in offense level for

Ms. Johnson on the basis of acceptance of responsibility.

## V.     The Court Should Find that the Loss Amount Exceeds $20 Million

Loss for credit card fraud is calculated as "the greater of actual loss or

intended loss."  U.S.S.G. § 2B1.1 cmt. 3(A).  The Guidelines define actual loss and

intended loss:

> (i)     Actual Loss.—"Actual loss" means the reasonably
> foreseeable pecuniary harm that resulted from the
> offense.
>
> (ii)    Intended Loss.—"Intended loss" (I) means the
> pecuniary harm that was intended to result from the
> offense; and (II) includes intended pecuniary harm that
> would have been impossible or unlikely to occur (e.g., as
> in a government sting operation, or an insurance fraud in
> which the claim exceeded the insured value).

U.S.S.G. § 2B1.1 cmt. 3(A)(i), (ii).  For counterfeit credit cards, the Guidelines

have an additional special rule:

> Notwithstanding subdivision (A), the following special
> rules shall be used to assist in determining loss in the
> cases indicated:
>
> (i)     Stolen or Counterfeit Credit Cards and Access
> Devices; Purloined Numbers and Codes.—In a case
> involving any counterfeit access device or unauthorized
> access device, loss includes any unauthorized charges
> made with the counterfeit access device or unauthorized

> access device and <u>shall be not less than $500 per access device</u>. . . .

U.S.S.G. § 2B1.1 cmt. 3(F)(i) (emphasis added)

The PSRs for both Defendants calculated the loss amount to be $27,996,000, based on the responses from banks to the Government's subpoenas arising out of its statistical sample of the 97,922 unique account numbers found in the possession of the Defendants and applying the $500 minimum loss amount to each valid account number. The Government double-checked all of the subpoena responses and updated its analysis in preparation for sentencing. This resulted in a slightly higher rate of valid account numbers, and the revised loss number should be $29,018,500.00.[7] Ex. 17.

Both Defendants attack this loss amount in several ways. First, they question whether sampling and extrapolation are permissible in determining loss amount. Second, they ignore the Sentencing Guidelines application notes that require a loss amount of at least $500 per access device (here, credit and debit account numbers), instead seeking to reduce the loss amount by attributing a smaller amount to each account number. Neither argument is consistent with the

---

[7] Both the $27,996,000 and the $29,018,500 loss amounts result in the same 22 level increase in the Defendants' offense level. Thus, for sentencing purposes, the million dollar difference is essentially immaterial.

Sentencing Guidelines or case law and the Court should find the loss exceeds $20

million, resulting in a 22 level increase in offense level.

### A.   Sampling Is a Proper Method to Determine a Reasonable Estimate of Loss

The Sentencing Guidelines state that "the court need only make a reasonable

estimate of the loss."  U.S.S.G. §2b1.1 cmt. 3(C).   Indeed, "[i]mportantly, the loss

calculation does not have to be rigorously precise, only a reasonable estimate given

the information available."  *United States v. Adigun*, 567 F. App'x 708, 718 (11th

Cir. 2014).

Here, the United States Secret Service identified over 97,000 unique account

numbers that could be legitimate credit or debit account numbers based on their

initial digits (the BINs) and total number of digits.  Because the Sentencing

Guidelines impose a minimum loss amount of $500 per access device (defined,

among other things, as an account number that can be used to obtain money, good,

services, or any other thing of value, *see* U.S.S.G. §2b1.1 cmt. 3(F)(i); 18 U.S.C.

§ 1029(e)(1)), the Government could have stopped there and argued that each of

the 97,922 account numbers be attributed a loss of $500, for a total loss amount of

over $48 million.  But, the Government instead undertook to analyze those

numbers more closely.  Issuing subpoenas for 97,000 accounts would have been

entirely unreasonable, however, and impose too high a burden on the Government

for sentencing purposes.  So, instead, the Government elected to conduct a

statistically valid random sampling of those account numbers to determine what

percentage were actual account numbers.  That sample resulted in responses

showing that 59 percent of the account numbers were actual account numbers – not

simply a random string of 16 digits.  Ex. 17.  This calculation was conservative.

The Government assumed that any account number for which a response was not

received are invalid and that all foreign account numbers are invalid.  Applying the

59 percent valid account number result to the 97,922 account numbers results in

the conclusion that the Defendants possessed 58,037 valid account numbers.

   Although it does not appear that there are decisions considering the use of

statistical sampling to determine loss amount under § 2B1.1, there are other

circumstances where Courts of Appeals have approved the use of sampling and

extrapolation to determine loss amounts.  For example, in *United States v. Rosin*,

the Eleventh Circuit held that it was proper to utilize a statistical sample to derive

preliminary loss figures in a health care fraud case.  263 F. App'x 16, 28-29 (11th

Cir. 2008).  And, in an analogous situation to fraud loss, multiple Courts of

Appeals have held that extrapolation from a sample is a valid basis for calculating

loss amounts in tax fraud cases.  *See United States v. Ukwu*, 546 F. App'x 305, 310

(4th Cir. 2013) (even imperfect sampling and extrapolation meets the standard for a reasonable estimate of the tax loss); *United States v. Murray*, 2012 WL 745617, at *5 (3rd Cir. 2012) ("[R]eliable extrapolations from representative sample data may be used to estimate the tax loss"); *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997) ("It is permissible for the sentencing court, in calculating a Defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown").[8]  Indeed, "[w]ith its mathematical superiority . . . random sampling has, for the past sixty years, been a hallmark of the scientific method."   Laurens Walker & John Monahan, Sampling Evidence at the Crossroads, 80 S. Cal. L. Rev. 969, 974 (2007).

Thus, this Court should reject the attempt by the Defendants to suggest that the sampling done by the Government was somehow improper or that it cannot be used to determine the appropriate loss amount attributable to the Defendant's offenses.

---

[8] The Eleventh Circuit expressly reserved addressing the use of a statistical sample in tax fraud cases in *United States v. Moss*, 543 F. App'x 959, 963 (11th Cir. 2013).

### B.      The Proper Loss Amount Is at Least $500 Per Access Device

The Defendants' objections essentially ignore the special rule in the

Sentencing Guidelines that imposes a minimum loss amount of $500 per

counterfeit credit card and access device.  U.S.S.G. § 2b1.1 cmt. 3(F)(i).  That

minimum is clear and unequivocal.  "In a case involving counterfeit or

unauthorized access devises, the minimum loss amount is $500 per access device."

*United States v. Torres-Bonilla*, 556 F. App'x 875, 882 (11th Cir. 2014).  As the

Eleventh Circuit has made clear, an account number, standing alone, is an

unauthorized access device.  *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th

Cir. 1997) (rejecting argument that only completed fake cards can be counted,

citing definition in 18 U.S.C. § 1029).  Thus, applying the $500 minimum to each

of the 58,000 account numbers is the proper measure of the minimum loss amount

attributable to the Defendants' fraud.

The Defendants seek to avoid this result by claiming that only accounts

where fraud had been reported can result in loss.  Of those, they seek to limit losses

to those cards that had fraud reported in Georgia in 2011.  Applying these filters,

the Defendants claim, would result in a loss amount of $6,011.66, which, quite

frankly, is absurd.  Given that more than $34,000 worth of gift cards were

deposited into Ms. Johnson's business account, that the Government can directly

trace $8,900 of fraud proceeds into Ms. Johnson's account, that Ms. Johnson was paying $4,000 a month in rent for her house (while only reporting an average income of $4,234.26 per month to her supervising probation officer, Doc. 97 at 38), that over $196,000 in cash was found in the house, that jewelry valued at over $382,000 was found in the house, and that $43,223.33 worth of gift cards were found in the house, the Court should reject Defendants' proposed loss amount out of hand. Their arguments have no basis in the facts or the law.

### 1. The Court should apply the mandated $500 loss amount for each account number

First, the loss amount for access devices is not limited to those access devices that have been used fraudulently. The loss calculation in § 2B1.1 is the greater of either actual loss or intended loss; fraudulent use would only be actual loss and limiting the calculation in that way would ignore intended loss. As the Eleventh Circuit held,

> The contention that only completed fake cards can be counted is without merit. Under 18 U.S.C. § 1029 it is unlawful to possess unauthorized access devices, defined as "any card, plate code, or account number, * * * that can be used, alone or in conjunction with another access device" to obtain a dollar figure.
>
> It is not required that an intended loss be realistically possible.

- 22 -

*Wai-Keung*, 115 F.3d at 877.  In that case, the district court calculated the loss

amount by "adding the number of completed false cards, unembossed cards,

signature panels, other unembossed cards found in a safe in the hotel where some

of Defendants were staying, and a list of account numbers" and multiplying this

number by $6,900, the amount charged per account in earlier weeks.  *Id.*  There

was no evidence that the unembossed cards, the signature panels, or the account

numbers on the list were ever used fraudulently, but the Court upheld the loss

calculation (even though the $6,900 is more than 13 times the $500 minimum).

     Other Courts of Appeals agree that the $500 per account number applies

even if there was no fraudulent use of the account number.  *See United States v.*

*Gilmore*, 431 F. App'x 428, 430-31 (6th Cir. 2011) (Application Note "sets a floor

for calculating the loss attributable to each devise, namely $500; it does not limit

loss calculations to devices actually used"); *United States v. Dodson*, 357 F. App'x

324, 325 (2d Cir. 2009) ($500 floor "even in the absence of an actual loss");

*United States v. Camper*, 337 F. App'x 631, 632 (9th Cir. 2009) (applying $500

loss amount to each stolen card even where no evidence card had been used).

     Indeed, using the $500 per account number is a very conservative approach

here.  The Government could advocate for the Court to use the credit limits of the

accounts to calculate intended loss.  *See Adigun*, 567 F. App'x at 719 (district court

did not err in using untapped credit limits on credit cards as intended loss).  Here,

using the credit limits of the accounts would significantly increase the loss amount.

For example, for the American Express account ending in 3007, the credit limit is

$25,000, or 50 times the minimum $500 per account loss.  Ex. 24.  Indeed, the sum

of the credit limits for just 15 accounts in the sample is $207,000.  Ex. 24 (showing

account and credit limits).  Using just this as the intended loss for the entire sample

and extrapolating across the universe of 97,000 account numbers would lead to a

loss amount of $52,000,000.  Any loss amount over $50 million would increase the

offense level by an additional two levels.[9]

Other evidence demonstrates that Defendants intended a loss for each

account of more than $500.  For example, in the discussion captured in

"convo 2.txt", the participants discuss using cards to make anywhere from $3,000

to $10,000 before the account is frozen.  And, the "reported bins.txt" file identifies

account numbers that generate fraudulent proceeds ranging from $500 at the low

end, to up to $7,000, for each account, and remark that they will work in the

---

[9] The Government is not advocating that the Court find a loss amount in
excess of $50 million.  Rather, this analysis merely demonstrates that the $500 per
account is a reasonable, conservative approach to loss amount.

United States.  Thus, a loss amount of $500 per card was entirely foreseeable to the Defendants.

### 2.     There is no basis to limit the losses to cards with fraud in Georgia in 2011

The Defendants argue that because they moved into the Betony Wood Trail house in 2011, any accounts where fraud occurred before 2011 or where the fraud occurred outside of Georgia should be excluded from the calculation.  The Defendants do not cite to any case law or Guidelines provisions to support this argument.  This Court should reject it.

Indeed, there is nothing to suggest that the Defendants only possessed the unauthorized access devises after they moved into the Betony Wood Trail house. Both Defendants admit that have been in a relationship since 2006 or 2007.  Black PSR ¶ 70; Johnson PSR ¶ 65.  The computer files found at that house and analyzed by the Secret Service show files containing credit and debit card account information dating back to 2007.   For example, the "MASTERS LIST.txt" file was created and accessed on December 4, 2007, and has 1,318 <u>pages</u> of credit and debit card information, including account numbers, bank names, card holder names, and card type.  Ex. 5.  The "convo 2.txt" file, dated December 26, 2010, shows a long-term business of credit card fraud.  Ex. 10.  Similar files contain

credit and debit card account numbers from February 27, 2007 ("LIST-1.txt", Ex. 6),  March 15, 2008 ("CE DISCO 1000 U MADE IT.txt", Ex. 7), June 10, 2008 ("PRIMO DISO GAS", Ex. 9), and December 28, 2010 ("12-23-10 100.txt", Ex. 11).[10]  Two files, date March 23, 2008 ("frttxt1.psd" and "bbk.psd", Ex. 8), contain images for BankOne credit cards, which could be used to create a physical card.

In Ms. Johnson's objections, she identifies accounts that she claims should not contribute to her loss, identifying the fraud losses that occurred either before 2011, out of Georgia, or both.  Taking three of those accounts for illustrative purposes demonstrates why the Defendants' arguments regarding temporal and geographic scope should be rejected.

First, consider the Discover account ending in 6967, which had a fraud loss reported on June 11, 2008 of $304.09 in Lithonia, Georgia.  The Defendants argue that this account should not be used to calculate loss because the fraud on it occurred in 2008, rather than 2011.  But, the file "PRIMO DISO GAS.txt", which was found on the Sony Magic Gate Memory Stick located in the Betony Wood Trail house, has that account number on it.  Ex. 9.  And the properties of that file

---

[10] These files are just a selection to demonstrate that the Defendants had the unauthorized access devices for many years.

show that it was created and accessed on June 10, 2008, the day before that account was used fraudulently.  Ex. 9.  Considering that the Defendants were in the business of creating fraudulent credit cards, it is perfectly logical that they created that fraudulent card on June 10 and then used it themselves, or provided it to someone else to use, on June 11.

A second example is similar.  Another Discover card, account number ending in 0656, was used fraudulently on April 2, 2008 in Brooklyn, New York.  Again, that account number appears in a file found in the Betony Wood Trail house, "CE DISCO 1000 U MADE IT.txt."  Ex. 7 (The relevant account number is the ninth account number on page 12 of that file).  The properties for that file shows that it was accessed on March 15, 2008, a little over two weeks before the account was used in Brooklyn.  The Defendants themselves, or someone buying the fraudulent card from them, could easily have traveled from Atlanta to Brooklyn in two weeks.

A third example is the Greater Texas Federal Credit Union account ending in 1213.  That account number is found in "brought base-1 org-267.txt" a file that was accessed on January 13, 2011.  Ex. 25 (7th and 8th line of page 2).  It was used in Alabama the next day, January 14, 2011, making $1,436.87 in fraudulent purchases, according to Defendants' analysis.  Again, the Defendants easily could

have created the card on January 13 and used it, or sold it to someone else who used it, in Alabama the next day.

There is no reasonable basis to eliminate these, or any other, accounts from the mandatory $500 per access device proscribed by the Guidelines and Defendants' argument should be rejected.

The Court should apply the $500 minimum loss amount for each access device to each of the 58,037 accounts and find a loss amount of $29,018,500.

## VI.   There Are More than 50 Victims

As with loss amount, there is a specific Application Note relevant to the calculation of victims for cases involving means of identification.  U.S.S.G. § 2B1.1 cmt. 4(E).  That comment states that for calculation of number of victims, "in a case involving means of identification 'victim' means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority."  *Id.*  "Means of identification" in pertinent part is defined as "any . . . number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . (C) unique electronic identification number . . . ."  18 U.S.C. § 1028(d)(7).

The Eleventh Circuit has held that a "'means of identification' includes an account number."  *United States v. Nikoghosyan*, 408 F. App'x 272, 274 (11th Cir.

- 28 -

2011) (counting individuals whose credit card account numbers were stolen as victims).  The Eleventh Circuit has also stated that "[o]nly those individuals whose information was used to make a fraudulent credit card or to make purchases constituted victims."  *United States v. Lopez*, 549 F. App'x 909, 912 (11th Cir. 2013).  Thus, although there were over 97,000 account numbers found, only those that were encoded onto physical cards or otherwise used to make purchases would give rise to victims.  *See United States v. Hall*, 704 F.3d 1317, 1323 (11th Cir. 2013) (possession and transfer of means of identification is insufficient to count as a victim for Guidelines purposes).

Recognizing this, in addition to creating a sample of all of the account numbers found, the Government also created a sample of just the completed physical cards that were found in the basement lab.  That sample consisted of 268 account numbers.  *See* Ex. 18.  Of those, 133 came back as accounts attributable to actual people.  *Id.*  Initially, the Government advocated extrapolating this result over the entire set of physical cards to arrive at the conclusion that there were over 430 victims (50% of the 875 completed, fraudulent cards that were found in the lab) whose means of identification were used to create fraudulent credit cards.  On

further reflection, although a strong argument can be made for extrapolation,[11] and the Government believes that the Defendants did encode an actual account number on more than 250 physical cards, the Government will only seek the four level enhancement for those victims whose means of identification were actually identified (the 133 accounts found to be valid from the subpoenas related to the physical cards).  U.S.S.G. § 2B1.1(b)(2)(B).  Adding the 17 accounts that were used to purchase American Express gift cards that swiped into the ESJ Group merchant account leads to the conclusion that there were at least 150 victims, resulting in a four level increase in offense level, as recommended by the PSRs.

## VII.   The Court Should Find That The Defendants Possessed a Dangerous Weapon in Connection with the Offense

The Sentencing Guidelines provide for a two level increase in offense level if the offense involved possession of a dangerous weapon in connection with the offense.  U.S.S.G. § 2B1.1(b)(15)(B).  Here, in addition to the fire-fight that took place in the foyer and master bedroom of the house involving both a shotgun and at least one pistol, there were two firearms found in the basement lab along with the

---

[11] Because the Guidelines are clear that the Court "need only make a reasonable estimate of the loss, " U.S.S.G. § 2B1.1 cmt. 3(C), extrapolation is appropriate in calculating the loss amount.  The Guidelines do not have similar language relating to victims, making the use of extrapolation less clear when it comes to determining the number of victims.

credit card and identification card making equipment, the computers, the other electronic equipment containing account numbers, and the fraudulent credit cards.

"A defendant's possession of a firearm can be shown by demonstrating . . . that he constructively possessed it, which means he had 'ownership, dominion, or control over an object itself or control over the premises in which the object is concealed.'" *United States v. Villarreal*, 613 F.3d 1344, 1359 (11th Cir. 2010). Here, Ms. Johnson was the sole signatory on the lease for the house and the two Defendants were the only residents. Ms. Johnson testified that she was aware of the room that contained the lab. Doc. 97 at 14. A personal photo of Mr. Black was in the room, above the desk on which one of the guns was found. Ex. 4 at 3. Thus, the Defendants had dominion and control over the premises in which the guns were found–the lab–and this evidence is sufficient to find that the Defendants possessed both firearms.

The question then turns to whether that possession was in connection with the offense. The Eleventh Circuit has "consistently applied an expansive definition to the 'in connection with' phrase in other guidelines contexts." *United States v. Bennett*, 494 F. App'x 949, 951 (11th Cir. 2012). In addressing the enhancement in § 2B1.1, the Court noted that it has held "that the ordinary meaning of 'in connection with' does not require that the weapon was used to facilitate the

underlying offense." *Id.*  Indeed, it has "held that, in certain circumstances, mere possession of a firearm can be enough to apply a sentencing enhancement." *United States v. Jackson*, 276 F.3d 1231, 1234 (11th Cir. 2001).  The Court found that the enhancement applied to a defendant who merely possessed a firearm while selling counterfeit currency.  *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1308 (11th Cir. 1999).  In *Matos-Rodriguez*, the Court rejected the defendant's argument that mere possession was insufficient to apply the enhancement, *id.* at 1306-07, and held that it was "reasonable to assume that [the defendant] had the gun present to prevent [theft of the counterfeit currency]."  *Id.* at 1307.  There was no evidence in that case that the defendant had ever used the firearm.  The Eleventh Circuit has stated where the underlying offense is possession of contraband, as it is here, those "crimes . . . lend support to an inference that the defendants would have, if necessary, used their firearms in furtherance of their crimes." *Jackson*, 276 F.3d at 1234.

Here, the Defendants had an entire room full of contraband, including the equipment to make fraudulent credit cards and identification cards and fraudulent credit cards themselves.  Both Defendants have plead guilty to possession of that equipment.  The guns were found in that room with the contraband.  In addition, in the room was almost $200,000 in cash.  This contraband was found because of a

home invasion that included a gun fight.  Given these facts, it is reasonable to conclude that the Defendants possessed the guns to protect their contraband and the proceeds of their crimes (the $200,000 in cash, over $380,000 in jewelry). *United States v. McClain*, 252 F.3d 1279, 1288 (11th Cir. 2001) (reasonable to infer that the defendant possessed the firearm to prevent a "rip-off"); *Matos-Rodriguez*, 188 F.3d at 1307 (reasonable to conclude that possession of firearm were to prevent theft of counterfeit currency).

Thus, the Court should conclude that the two level enhancement for possession of a dangerous weapon in connection to the offense applies to both Defendants.

## VIII.  Ms. Johnson Should Receive the Two Level Enhancement for Obstruction

The Sentencing Guidelines provide for a two level increase in offense level for a defendant who "willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense, and . . . the obstructive conduct related to . . . the defendant's offense of conviction . . . ."  U.S.S.G. § 3C1.1.  The Application Notes to that section state that committing perjury is conduct to which the adjustment applies.  U.S.S.G. § 3C1.1 cmt. 4(B).  "A defendant commits perjury by providing false testimony

- 33 -

concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Cruz-Camacho*, -- F. App'x --, 2014 WL 5011118, *3 (11th Cir. Oct. 8, 2014). Material means something that, "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. 6. "The threshold for materiality 'is conspicuously low.'" *United States v. Gillespie*, 568 F. App'x 706, 710 (11th Cir. 2014).[12]

Here, Ms. Johnson perjured herself during the hearing in front of this Court challenging the order of detention. Doc. 97. During that hearing, Ms. Johnson took the stand and testified regarding the seven driver's licenses that had her photo on them and that were found at her house. She was asked about these IDs on direct examination:

> Q. There are some – there's a point that is raised that upstairs in your office on the main floor, not the basement floor with the locked room with the matters that you are not familiar with, but upstairs there's I.D. with your name on it and that the name and the state and the location do not match who you are as Tina Johnson. It has a different name and a different state I.D. Are you familiar with that I.D.?

---

[12] To apply the enhancement, at sentencing, "[t]he district court must make an independent factual finding that the defendant gave perjured testimony on a material matter." *United States v. Vallejo*, 297 F.3d 1154, 1168 (11th Cir. 2002).

A. Yes, sir, I am.

Q. Where was that I.D. upstairs in your library?

A. <u>It was in a safe that had been in a storage for more than eight years</u> –

Q. Did you know that – I'm sorry. Did you know that I.D. was in that safe?

A. Yes, I did, after it was brought to my attention that they had opened the safe and found it along with a government passport that had my married name on it, along with some identification for my son.  <u>But the stuff was very old.</u>  Even the picture on the I.D.'s is such an old picture.

Q. Was it a current picture since you have been on supervised release, that that's an identification that you created at any time that you've been on supervised release?

A. No, sir.  <u>That identification is very, very old</u>.  That picture is very, very old.

Q. Had you ever used that false identification since you've been on supervised release?

A. No, sir; and even prior it was never used.  <u>It was for novelty.  It wasn't anything that has been used in any way criminally or anything of that nature.</u>

Doc. 97 at 19-20 (emphasis added).  Although Ms. Johnson testified as though

there were a single fake ID, in fact there were seven.  Doc. 97 at 26-27; Ex. 26.

- 35 -

She admitted that each has her picture on it, with someone else's name.  Doc. 97 at 26-28.  Three of the licenses have a clear issue date printed on them:  11-21-2009 for the Oregon license in Allison Dalton's name; 8-23-09 for the Illinois license in Mary Hollister's name; and 8-23-09 for the Illinois license in Donna Long's name.  Ex. 26 at 1, 4, 5.  The two California licenses also appear to have an issue date of 3/21/2009 on both of them, although it is not specifically identified as such.  Ex. 26 at 6, 7.

Her testimony that these IDs had been in storage for more than eight years would lead to the conclusion that they were produced no later than 2005.  Quite simply, this is preposterous given the issue date on the licenses.  Because she was on supervised release in 2009 (and 2010 and 2011), when these licenses almost certainly were created, she lied to the Court about how long she had had them.  Also, it is impossible to believe that she had seven high quality fake IDs for "novelty" purposes when she had already been convicted of a federal fraud offense and had a credit card and ID-making lab in the basement of her house.  Ms. Johnson plead guilty to possession of five or more false identification documents, 18 U.S.C. § 1028(a)(3), and possession of document-making implement.  Her false testimony is directly relevant to these charges and the Court should impose the two level enhancement for obstruction.

## IX.   Ms. Johnson Should Get No Reduction in Offense Level for Acceptance of Responsibility

The PSR recommends reducing Ms. Johnson's offense level by two level for acceptance of responsibility because she entered a guilty plea.  Johnson PSR ¶ 46; *see* U.S.S.G. § 3E1.1(a).[13]  But, Ms. Johnson entered her plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), admitting that the Government could prove the charges in the indictment but continuing to express her innocence and deny criminal intent.  The Court accepted that plea over the Government's objection.

In determining whether a defendant qualifies for a reduction due to acceptance of responsibility, the Court should consider whether the defendant truthfully admitted the conduct that comprised the offense of his conviction. U.S.S.G. § 3E1.1 cmt. 1(A).  "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."  *Id.*, cmt. 3.  "The defendant bears the burden of clearly demonstrating acceptance of responsibility and must present more than just a guilty plea."  *United States v. Moriarty*, 429 F.3d 1012, 1023 (11th Cir. 2005), quoting *United States v. Sawyer*, 180 F.3d 1319, 1323 (11th Cir. 1999).  In determining acceptance, "the qualifications a defendant states

---

[13] Because Ms. Johnson entered an *Alford* plea and has not otherwise accepted responsibility for her offenses, the Government declines to move for the additional one level reduction available under U.S.S.G. § 3E1.1(b).

in his guilty plea may be evidence that he has not fully recognized and accepted personal responsibility for the crime." *United States v. Rodriguez*, 905 F.2d 372, 374 (11th Cir. 1990).[14]

Here, not only did Ms. Johnson enter an *Alford* plea, but she also denied knowledge of the contents of the credit card lab in the basement of her house. Doc. 97 at 14-15. She made the same denial during her change of plea hearing. As discussed above, at her bond hearing she denied any criminal intent with respect to the seven fake IDs with her pictures on them, claiming they were simply novelty items. Doc. 97 at 20. In her objections to the PSR, she continues to deny that those cards give rise to criminal culpability. Johnson Obj. to PSR, at 6. Indeed, other than the fact of her guilty plea, she has made no showing of acceptance. This is far short of clearly demonstrating her acceptance of responsibility that is required to be entitled to the two level reduction in offense level. *See Rodriguez*, 905 F.2d at 374 (no reduction for acceptance of responsibility even where defendant voluntarily forfeited money, provided

---

[14] The Eleventh Circuit suggests in *Rodriguez* that an *Alford* plea does not automatically make a defendant ineligible for a reduction for acceptance of responsibility. 905 F.2d at 373, 374. Considering the fact that the plea was pursuant to *Alford* as well as other appropriate evidence is permissible. *Id.*

- 38 -

information relating to the crime to authorities, and acknowledged at the time of his arrest that he may have done something wrong).

Thus, the Court should not reduce Ms. Johnson's offense level by two for acceptance of responsibility.

## X.    Evaluating an Appropriate Sentence under 18 U.S.C. § 3553.

To assist the Court in imposing a reasonable sentence under 18 U.S.C. § 3553, the Government submits the following for the Court's consideration.

### A.    The nature and circumstances of the offense and the history and characteristics of the defendant.

The nature and circumstances of the offense are described above. This was a massive credit card fraud operation, with a wide-ranging impact. In addition, as discussed in more detail below, this is not a typical white collar crime, where the only harm is financial. In addition to the significant financial impact producing fraudulent credit cards causes, this offense also led to incredible violence.

With respect to the history and characteristics of the Defendants, both have criminal histories that suggest they have merely been living a life of fraud. Indeed, they were living in a mansion, paying $4000 a month in rent, with no apparent source of legitimate income. In addition to the rent, they were able to accumulate almost $200,000 in cash, over $380,000 worth of jewelry, and $43,000 worth of

gift cards.  Ms. Johnson lied to her supervising probation officer about where she

was living and appears to have lied to the officer about the amount and source of

her income, as well.  Ms. Johnson was on supervised release for another federal

fraud conviction when she joined with Mr. Black to undertake this scheme of

credit card fraud.  And the documents found on the computers in the lab suggest

that the Defendants were engaged in other fraud as well, such as bank fraud.  See

Ex. 10.

**B.      The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense and to afford adequate deterrence to criminal conduct**

Unlike many federal fraud convictions, this case is steeped in violence.  It is

reasonable to conclude that the violent and bloody home invasion was a result of

the credit card fraud scheme the Defendants conducted.  And, it is not just the

Defendants who were impacted – one of the home invaders was shot in the head,

presumably by either Mr. Black or Ms. Johnson.  In addition, there were two

firearms in the lab.  Thus, although financial fraud crimes are serious standing

alone, this particular offense is even more serious given the violence associated

with it, violence that quite frankly is more closely associated with drug dealing

than credit card fraud.

**C.**     **The need for the sentence imposed to protect the public from further crimes of the Defendant and to provide the Defendant with needed educational or vocational training or other correctional treatment in the most effective manner.**

It does not appear that Mr. Black has had a full-time job in some time, reporting monthly earnings of zero to $2000 to the probation officer.  *See* Black PSR ¶ 78.  It is clear that he has been financing his lifestyle through his fraud. Lacking any apparent job, trade or skill, Mr. Black needs to be incarcerated to keep him from preying on members of the public.  While incarcerated, he can learn a trade or skill, so that he will be prepared to work for a living, to earn a wage or income, and to pay taxes like other Americans.

Ms. Johnson has more education than Mr. Black and appears to have had at least some minimal work beyond fraud since being released from prison. But, she has demonstrated that she will return quickly to fraudulent activity, even while on supervised release from her prior federal fraud conviction.  A significant sentence is necessary to protect the public.

**XI.   Sentencing Recommendation**

Applying the enhancements in the PSRs that were not objected to as well as those discussed above would result in the following Guidelines recommendations for each Defendant:

- 41 -

| Paul Black | | |
|---|---|---|
| Section | Description | |
| § 2B1.1(a)(2) | Base Offense Level | 6 |
| § 2B1.1(b)(1)(L) | Loss amount: $29,000,000 | +22 |
| § 2B1.1(b)(2)(B) | 150 victims | +4 |
| § 2B1.1(b)(10)(C) | Offense involved sophisticated means | +2 |
| § 2B1.1(b)(11) | Offense involved the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature | +2 |
| § 2B1.1(b)(14) | Offense involved the possession of a dangerous weapon in connection with the offense | +2 |
| § 3E1.1(a), (b) | Acceptance of Responsibility | -3 |
| | Adjusted Offense Level | 35 |
| | Criminal History Category | IV |
| Sentencing range, 235-293 months | | |

| Ednecdia Johnson | | |
|---|---|---|
| Section | Description | |
| § 2B1.1(a)(2) | Base Offense Level | 6 |
| § 2B1.1(b)(1)(L) | Loss amount: $29,000,000 | +22 |
| § 2B1.1(b)(2)(B) | 150 victims | +4 |
| § 2B1.1(b)(10)(C) | Offense involved sophisticated means | +2 |
| § 2B1.1(b)(11) | Offense involved the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature | +2 |
| § 2B1.1(b)(14) | Offense involved the possession of a dangerous weapon in connection with the offense | +2 |
| § 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| | Adjusted Offense Level | 40 |
| | Criminal History Category | III |
| Sentencing range, 360-Life (combined statutory maximum is 45 years) | | |

- 42 -

The Government recommends a sentence of 240 months for both Defendants.  Given the violence associated with this case, a Guidelines sentence for Mr. Black is appropriate.  The Government suggests a sentence slightly above the low end of the Guidelines range is appropriate giving consideration to the factors set forth in § 3553.

The Government recommends the same sentence for Ms. Johnson.  Ms. Johnson presents a more difficult case than Mr. Black.  Her criminal history category is less than Mr. Black's, even taking into account the fact that she committed the offense while on supervised release.  If she had accepted responsibility and had not perjured herself, her Guidelines range would have been 210-262 months.  She did not, so her Guidelines range (as advocated by the Government) is 360-Life.  Notwithstanding the seriousness of the fraud in this case and the significant violence associated with the crime, 30-years imprisonment as contemplated by the Guidelines exceeds what the interests of justice demand. Recognizing this, the Government recommends a sentence of 240 months for Ms. Johnson.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY


/s/CHRISTOPHER J. HUBER
ASSISTANT UNITED STATES ATTORNEY

600 U.S. Courthouse
75 Spring St., S.W.
Atlanta, GA  30303
(404)581-6292
(404)581-6181 (Fax)

Georgia Bar No. 545627
chris.huber@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served via the CM/ECF system which will automatically send email notification of such filing to the following attorney(s) of record:

> Tony L. Axam
> AXAMLAW
> tony.axam@axamlaw.com
>
> Akil Secret
> The Secret Firm, P.C.
> Akil.Secret@Gmail.com
>
> Ashutosh S. Joshi
> Joshi Law Firm
> joshilawfirm@msn.com

This 24th day of October, 2014.

> /s/CHRISTOPHER J. HUBER
> ASSISTANT UNITED STATES ATTORNEY